Filed 9/25/23  Garcia v. Harris CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| ROBERT D. GARCIA et al., | D080385 |
| Plaintiffs, Cross-defendants, and Appellants, | |
| v. | (Super. Ct. No. 37-2019-00061532-CU-OR-NC) |
| RHONDA F. HARRIS et al., | |
| Defendants, Cross-complainants, and Respondents. | |

APPEAL from judgments of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Hall Griffin, Howard D. Hall, Valerie J. Schratz and Jeremy T. Katz for Plaintiffs, Cross-defendants and Appellants.

Hilbert & Satterly and Joseph A. LeVota for Defendants, Cross-complainants and Respondents.

## INTRODUCTION

In 2018, Robert and Paulette Garcia bought a six-acre horse ranch (Parcel 20) in Warner Springs, a small unincorporated rural community in

northern San Diego County that sits on the Pacific Crest Trail. Their neighbors, Rhonda and Sean Harris, owned an adjacent three-acre parcel (Parcel 30) that included a dirt driveway along the western edge of their land. The driveway provided ingress and egress to another, land-locked three-acre parcel (Parcel 31) owned by a third party. Neither of the parcels owned by the Garcias and Harrises are land-locked because they are each adjacent to the main road.

In the early 1950s, all three parcels were owned by the same owner. Over time, the three parcels were sold separately to various individuals. In 1966, in connection with the sale of Parcel 31, an express easement was created to give the new owner of Parcel 31 use of the driveway to access their land-locked parcel. In 1969, the owner of Parcel 31 acquired Parcel 20. Common ownership of Parcel 20 and Parcel 31 continued until 2018, when Patricia Phelps sold Parcel 20 to the Garcias and Parcel 31 to the third party. Parcel 31 continued to have an express easement to use the driveway, while the Garcias' land did not.

When the Garcias bought their land, their purchase agreement contained a provision requiring "[c]onfirmation of recorded shared driveway easement" before close of escrow. They also received Phelps's disclosure advising them that "entrance drive is easement across [the Harris's property]" and "Seller does not guarantee access to the property over the current driveway." Phelps tried to have the Harrises execute documents to create an express easement for use of their driveway for the benefit of Parcel 20 before she sold it to the Garcias. The Harrises declined. Undeterred, Phelps conveyed Parcel 20 to the Garcias with a grant deed that purported to contain an express easement for use of the Harrises' driveway. When the

Garcias moved onto their land, the Harrises told them they did not have an easement to use the driveway.

This lawsuit followed. The Garcias sued the Harrises, asserting three causes of action for prescriptive easement, equitable easement, and judicial declaration in favor of their right to use the driveway. The Harrises counter-sued to quiet title in favor of no express easement benefitting the Garcias' land. Following a two-day bench trial, the trial court found for the Harrises on all three causes of action in the Garcias' complaint, as well as on their cross-complaint to quiet title. We affirm both judgments in favor of the Harrises.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Evidence at Trial*

During the two-day bench trial, the trial court received a written stipulation of facts regarding the historical ownership of the three parcels. But as the court noted in its statement of decision, the stipulated facts did not contain "all of the facts" the court considered relevant to the outcome of the case. The court received trial testimony from seven witnesses, including the Garcias and Harrises, the deposition testimony of Phelps, and numerous exhibits. The court also conducted a site visit with the parties' consent. The evidence before the court established the following facts.[1]

---

[1]  " 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.)  " 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.

A.      *The Properties and Current Ownership*

Warner Springs is a rural area in northern San Diego County.  There are three separately assessed parcels of land in Warner Springs at issue in this lawsuit.  The Garcias own six acres of land in Parcel 20.  The Harrises own three acres in Parcel 30.  Randall McKee owns three acres in Parcel 31.[2]

---

[Citations.]  Moreover, findings of fact are liberally construed to support the judgment.' " (*Ibid.*)

[2]     McKee is not a party to this litigation.

The following satellite image from the trial evidence shows the general locations of the three parcels:[3]

Fig. 1



Paradise Valley Road runs east-west along the southern boundary of Parcel 20 (the Garcias' land) and Parcel 30 (the Harrises' land). Parcel 31 (McKee's land) abuts the northern boundary of Parcel 30 and the upper eastern boundary of Parcel 20. Parcel 31 is land-locked, while Parcel 20 and Parcel 30 are not.

---

3    The written annotations are by the parties. We have added the yellow dashed lines to make clearer the general demarcation of the three parcels.

B.	*1966:  Creation of the Express Easement for the Benefit of Parcel 31*

As of 1951, Herman Silveria owned all three parcels.  In that year, Silveria sold Parcel 20.  In 1966, Silveria sold Parcel 31 to the Tobins.

In connection with the sale to the Tobins, Silveria created an express easement " 'generally located on the [w]estern 30-foot section of Parcel 30' " for the benefit of Parcel 31 (the Easement).  The 1966 grant deed to the Tobins specifically defined the Easement as:

> "PARCEL 2:
>
> "An easement for ingress and egress, repairs, installation and maintenance of water, gas, sewer, and power lines and conduit, installation and maintenance and repairs of poles, guide wires and lines for transmission of electrical energy over [legal description omitted]."

The Easement appears as the yellow-striped portion of the following excerpted and annotated parcel map from the trial evidence:

Fig. 2



Within the Easement's boundaries is a dirt driveway that runs south-north along the property line with Parcel 20 for the entire western side of Parcel 30 and terminates at Parcel 31 (the Driveway). The Driveway, at issue in this appeal, is the sole route of access to Parcel 31 from any public road.

C.    *1969 to 2005:  Common Ownership of Parcels 20 and 31*

In 1969, the Tobins acquired Parcel 20 to add to their ownership of Parcel 31, for a total of nine acres. The two parcels, however, remained at all times separately assessed.

In 1975, the Tobins sold Parcels 20 and 31 to the Johnsons. Parcels 20 and 31 continued to be held under common ownership by a series of owners between 1975 and 2018.

From 1976 to 2003, Caroline Showman and her husband owned the two parcels after purchasing them from the Johnsons. The Showmans used the nine-acre property as a weekend and vacation destination until 2002, at which time they made it their primary residence. The Showmans lived in a house on Parcel 20. To access their house on Parcel 20, the Showmans would turn north from Paradise Valley Road onto the Driveway. Importantly, they would travel down the Driveway over Parcel 30 until the Easement terminates at Parcel 31; and once at their property on Parcel 31, they would cross over to Parcel 20. Mrs. Showman used the Driveway at least once or twice each week when she lived there full-time, without ever encountering any issues.

In 2003, Valerie Schmidt and her then-husband purchased the two parcels from the Showmans. Schmidt bought the nine-acre property to set up a horse business on it. She added horse-related facilities to Parcel 20, including a barn, pens, a hay shed, and wash racks. Customers of the horse business visited the property once every month or two. Like the Showmans, Schmidt lived in the house on Parcel 20. She used the Driveway in the exact same manner as the Showmans to access the house, including going to Parcel 31 before crossing over to Parcel 20, without any issues.

D.    *2005 to 2018: Phelps's Ownership of Parcels 20 and 31*

In 2005, Phelps became co-owner of Parcels 20 and 31 with Schmidt. In 2008, she established her sole ownership of both parcels. Phelps operated the nine-acre property as a horse ranch and in 2008 hired Dawn Bayuk to manage it. Phelps and Bayuk both lived on Parcel 20, with Phelps in the

main house and Bayuk in a separate small house until she left the ranch in 2015.

By 2006, Parcels 20 and 31 were entirely fenced around their boundaries, aside from the boundary between them.  At the end of the Driveway was a gate in the fence between Parcels 30 and 31.  Like the Showmans and Schmidt, Phelps and Bayuk used the Driveway to get to Parcel 31 and, after entering the gate onto Parcel 31, they would cross over to Parcel 20.

In addition to Phelps and Bayuk, other people also used the Driveway to access the ranch during Phelps's ownership.  This included Bayuk's family members who lived with her at various times, Phelps's guests, and ranch customers.  Periodic hay and feed deliveries were made to the ranch using the Driveway, and a veterinarian, farrier, and horse dentist also came to the ranch from time to time.

In 2006, shortly after Phelps became co-owner of Parcels 20 and 31, the Harrises purchased Parcel 30.  Both Sean and Rhonda Harris saw Schmidt, Phelps, and Bayuk use the Driveway to access the houses on Parcel 20.  Mr. Harris did not have any concerns about their use of the Driveway.  As to Phelps specifically, he did not object to her use of the Driveway because she "accesse[d] the parcel that ha[d] the valid easement" (i.e., Parcel 31), "and from there she can go wherever she wants.  She's on her property."

Mrs. Harris reviewed the Harrises' 2006 grant deed after she had a conversation with Phelps about the Driveway.  Based on that review, Mrs. Harris believed the Easement over Parcel 30 benefitted Parcels 20 and

9

31 together as a single, undivided property.[4] For her part, Phelps did not believe her use of the Driveway was hostile to the Harrises. Only once did Phelps obtain permission from the Harrises in connection with the Driveway, and that was to widen the entrance to the Driveway so Phelps and Schmidt could get a manufactured home onto Parcel 31.

E. *June 2018: Phelps Sold Parcel 20 to the Garcias and Parcel 31 to McKee*

As early as 2009, the Harrises heard Phelps was considering selling her nine-acre property and was "test[ing] the waters" to see if she could sell Parcels 20 and 31 together. In early 2018, they learned Phelps intended to sell the two parcels separately. At that time, the Harrises considered purchasing Parcel 31 to extinguish the Easement over Parcel 30. They had "casual" conversations with Phelps about purchasing some portion of her nine-acre property. But in March 2018, Phelps had agreed to sell Parcel 31 to McKee and Parcel 20 to the Garcias.

Both McKee and the Garcias closed escrow the same day in June 2018. The parties agree that Parcel 31 benefits from the Easement created in 1966, which allows McKee to use the Driveway to access his property.

The Garcias' purchase agreement with Phelps, however, contained a provision requiring "[c]onfirmation of recorded shared driveway easement" before close of escrow. Additionally, Phelps provided the Garcias with a disclosure advising them that the "entrance drive is easement across [Parcel 30]" and "Seller does not guarantee access to the property over the current driveway [and through] the existing gate." The Garcias both admitted the

---

[4] Mrs. Harris was incorrect, as the Harrises' 2006 grant deed does not mention any easement.

10

escrow company never gave them written confirmation of any easement. Nor did they contact Phelps or the Harrises about any easement.

Mr. Harris testified that before the sale to the Garcias closed, Phelps's attorney "came to [them] with paperwork saying we don't have a valid easement, we need you to sign this so we can sell [P]arcel 20." Mrs. Harris understood the proposed paperwork would give Phelps "rights to the [D]riveway so she could sell the property." The Harrises refused to sign. As Mrs. Harris explained, she and her husband were "shocked" at Phelps's request because she was "asking [them] to give her access to property that would benefit her in a sale without any offer of compensation" to them. The Harrises found the "whole thing . . . quite hostile" because Phelps's attorney threatened them, "if you don't sign it, we could sue you and we'd win."

Despite the Harrises' refusal to create an express easement on their property to benefit Parcel 20, Phelps conveyed Parcel 20 to the Garcias with a grant deed that contained an express easement for use of the Driveway. The purported easement referenced the Tobins' 1966 grant deed, which created the Easement over the Harrises' land for the benefit of Parcel 31. The Garcias' grant deed defined the purported easement as "Parcel 2" with the following description:

> "An easement for ingress and egress, repairs, installation and maintenance of water, gas, sewer, and power lines and conduit, installation and maintenance and repairs of poles, guide wires and lines for transmission of electrical energy over that portion of the Southwest Quarter of the Northwest Quarter of Section 26, Township 9 South, Range 2 East, San Bernardino Base and Meridian, according to the United States Official Survey thereof, approved January 31, 1895, in the County of San Diego, State of

11

California, *in Grant Deed recorded October 31, 1966*, as Instrument No. 173195, of Official Records[.]"[5]  (Italics added.)

Mr. Garcia, who had previously worked as a commercial real estate banker, assumed from its inclusion in his grant deed that the purported express easement granting him use of the Driveway on the Harrises' land had been confirmed when the sale closed in June 2018.  He acknowledged, however, that he never reviewed the Tobins' 1966 grant deed referenced in the purported easement's description.

F.    *June 2018 to Present Day:  The Garcias' Ownership*

The Garcias continue to own and reside on Parcel 20.  They have been using the Driveway on the Harrises' land as the sole route to access their property since their purchase in June 2018.  Although the Harrises contend the Garcias use the Driveway more than their predecessors, they believe the Garcias' use has caused "[n]ormal wear and tear," "[n]othing extraordinary."

The Garcias never asked the Harrises for permission to use the Driveway and have never received any easement from the Harrises for use of the Driveway.  To the contrary, shortly after the Garcias moved onto their land, Mrs. Harris told the Garcias they did not have any easement to use the Driveway.  This prompted Mr. Garcia to review the 2018 grant deed from

---

[5]    The Garcias' grant deed also contained a second express easement, which burdened Parcel 31 for the benefit of Parcel 20.  This easement is identified as "Parcel 3" in the Garcias' grant deed and allows ingress and egress from the southwest corner of Parcel 31 over to Parcel 20.  The area of this easement appears as the red-striped portion of Fig. 2, *ante*.  This second easement, in combination with the purported easement over Parcel 30, would allow the Garcias to use the Driveway like their predecessors, namely by traveling down the Driveway over Parcel 30, through the gate between Parcels 30 and 31 onto Parcel 31, and then across the southwest corner of Parcel 31 to cross over onto Parcel 20.  The second easement is not at issue in this appeal.

Phelps, which showed an easement. He then told Mrs. Harris that he and his family had a right to use the Driveway.

The Harrises later discovered the Garcias' grant deed contained the purported easement burdening the Harrises' land for the benefit of Parcel 20. The Harrises had their attorney send a letter to the Garcias in August 2019 informing them of the invalidity of the purported easement. The Garcias, however, did not change their use of the Driveway. Instead, this litigation followed.

## II.

### *The Trial Court's Statement of Decision*

In November 2019, the Garcias filed this lawsuit, asserting three causes of action: (1) to quiet title for a prescriptive easement, (2) for an equitable easement, and (3) for declaratory relief. In April 2021, the Harrises filed a cross-complaint against the Garcias to quiet title as to the purported express easement in the 2018 grant deed conveying Parcel 20 from Phelps to the Garcias.[6]

Following the bench trial, the trial court issued a 20-page statement of decision in favor of the Harrises on both the Garcias' complaint and the Harrises' cross-complaint. Before adjudicating the Garcias' claims, the court expressly found "certain portions of the testimony of Robert Garcia and Paulette Garcia [we]re not credible," particularly their testimony about "the

---

6    In June 2020, the Harrises sued Phelps in small claims court, asserting she slandered the Harrises' title to Parcel 30 by purporting to convey to the Garcias an express easement for use of the Driveway. The Harrises ultimately obtained a default judgment for the maximum amount of $10,000 when Phelps failed to appear.

potential expense and difficulty of creating a driveway [for ingress and egress] on their own property."

On the Garcias' first cause of action for a prescriptive easement to use the Driveway, the trial court found the Garcias failed to establish the required five years of adverse use. On their second cause of action for an equitable easement, the court found the Garcias' trespass on the Harrises' land was not innocent and the hardship to the Garcias in ceasing use of the Driveway was not greatly disproportionate to the hardship to the Harrises from the continued encroachment. On their third cause of action for declaratory relief, the court rejected both theories advanced by the Garcias. It found no one had obtained an irrevocable license to use the Driveway, and the doctrine of after-acquired title did not apply to create an express easement benefitting Parcel 20.

In their cross-complaint to quiet title, the Harrises sought a judgment to quiet the Harrises' interest in Parcel 30 "free and clear" of the purported express easement in the 2018 grant deed from Phelps to the Garcias. The trial court granted the Harrises' request. Consistent with its findings on the Garcias' cause of action for declaratory relief, the court found Parcel 20 did not benefit from an express easement to use the Driveway over Parcel 30. As a result, Phelps's purported conveyance of such easement to the Garcias was invalid.

## DISCUSSION

### I.

### *Standard of Review*

The parties do not agree on the standard of review that governs this appeal. The Garcias assert that we should apply de novo review to all issues on appeal because "[t]he facts in this case are almost entirely undisputed"

and the appeal "predominately concerns" application of law to those undisputed facts. (See *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 [where the issue involves the application of law to undisputed facts, review is de novo].) The Harrises contend we should review the denial of a prescriptive easement for substantial evidence and the denial of an equitable easement and irrevocable license for abuse of discretion. We agree with the Harrises.

Although the trial court found the parties' stipulated facts "streamlined the presentation of evidence at the trial," it expressly noted the stipulated facts did *not* contain "all of the facts" it found relevant to its decision. Instead, the court's decision rested on additional facts it determined after a two-day trial involving eight witnesses, numerous exhibits, and the court's inspection of the properties in question. And in finding those additional facts, the court made credibility determinations. We do not review such factual findings de novo. (See *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 ["If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test."].)

We agree with the Harrises that substantial evidence review and its equitable equivalent—abuse of discretion—apply to our consideration of the court's denial of a prescriptive easement, equitable easement, and irrevocable license as a basis for declaratory relief. (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358 (*Executive Life*) [employing abuse of discretion review as "the equivalent of the substantial evidence test"].) Substantial evidence review requires "view[ing] the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all

15

reasonable inferences in favor of the decision of the trial court." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203.) In other words, "we must accept any reasonable interpretation of the evidence which supports the trial court's decision." (*Ibid.*)

As for the trial court's denial of an express easement under the doctrine of after-acquired title, the Harrises do not propose an applicable standard of review. We interpret deeds in the same manner as contracts. (*Pear v. City and County of San Francisco* (2021) 67 Cal.App.5th 61, 70 (*Pear*).) The de novo standard therefore governs our review of how the deed language should be interpreted. (*Id.* at p. 71.) However, to the extent extrinsic evidence must be used to resolve ambiguities in a deed's language, we review the trial court's factual findings regarding such extrinsic evidence for substantial evidence. (*Id.* at pp. 70–71.) We set forth the appropriate standard of review in our analysis of each cause of action.

The Harrises contend the Garcias' failure to identify the correct standard of review is a tacit admission their appeal lacks merit (*Sonic Manufacturing Technologies, Inc., v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 ["[f]ailure to acknowledge the proper scope of review is a concession of a lack of merit"]), and because they have relied on the wrong standard of review, they have failed to satisfy their appellate burden for a substantial evidence standard of review. As a result, the Harrises urge us to treat the issues reviewed for substantial evidence as waived and presume the record contains evidence to sustain every finding of fact. (See *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 ["A party who challenges the sufficiency of the evidence to support a finding must

16

set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable."].)

We agree the Garcias do not appropriately acknowledge all of the evidence on each of their positions, specifically unfavorable evidence. Most notably, the Garcias overlooked the trial court's findings from its inspection of the properties regarding the difficulty of putting in a new driveway for ingress and egress on the Garcias' land. Nor do the Garcias address the court's findings that the Garcias' own testimony on that point lacked credibility. The Garcias' attempt to ignore contrary evidence is evident from their careful framing of the facts as "*almost* entirely undisputed." (Italics added.) Despite these and other deficiencies in the Garcias' appeal, we exercise our discretion to address the merits of their arguments.

II.

*Prescriptive Easement*

A party claiming a prescriptive easement "must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570 (*Warsaw*); see Civ. Code, § 1007; Code of Civ. Proc. § 321.) " 'The term "adverse" in this context is essentially synonymous with "hostile" and " 'under claim of right.' " ' " (*McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1181 (*McBride*).) " 'To be adverse to the owner a claimant's use must give rise to a cause of action by the owner against the claimant.' " (*Ibid.*) Thus, " 'a prescriptive easement can arise only if the owner had an opportunity to protect his or her rights by taking legal action to prevent the wrongful use, yet failed to do so.' " (*Ibid.*)

As the trial court correctly found, the Garcias' own use of the Driveway (hostile or not) does not satisfy the requisite five years of adverse use.

17

(*Warsaw*, *supra*, 35 Cal.3d at p. 570.) They purchased their land in June 2018 and filed this lawsuit in November 2019. As a result, the Garcias must rely on hostile use by their predecessors to " 'tack[ ]' " onto their own adverse use to meet the five-year requirement. The court rejected the Garcias' attempt to combine their use with the prior owners' use to establish the statutory five-year period of adverse use, because it found no prior use was hostile.

The trial court found use of the Driveway by Phelps (and the other previous owners) was not hostile because Phelps owned both Parcels 20 and 31, and Parcel 31 benefitted from the Easement which expressly allowed Phelps to use the Driveway for ingress and egress. The court also rejected the Garcias' argument that Phelps's use should be considered hostile because it went beyond the scope of the Easement. And because "Phelps and her predecessors had an express easement to use the [D]riveway by virtue of their ownership of Parcel 31, [the court found] the Harrises had no legal right to prevent Phelps and her predecessors from using the [E]asement in the manner in which they did." For the same reason, the court also found "Phelps and her predecessors . . . did not commit a trespass during the alleged prescriptive period." Last, the court acknowledged, though it did not find this fact dispositive, that Phelps herself testified she did not believe her use of the Driveway was hostile to the Harrises.

On appeal, the Garcias contend the trial court erred in finding they were not entitled to a prescriptive easement. Their arguments coalesce around the contention that their predecessors' use of the Driveway was hostile because it exceeded the scope of the Easement created in 1966. As hostility is one of the elements necessary to establish a prescriptive easement, its existence is a question of fact that we review for substantial

18

evidence. (*Warsaw*, *supra*, 35 Cal.3d at pp. 570–572.) We conclude substantial evidence supports the court's finding that use of the Driveway by the Garcias' predecessors was not hostile to the Harrises.

The Easement allowed the Garcias' predecessors (who owned Parcel 31) to use the western 30 feet of Parcel 30 "for ingress and egress" to Parcel 31. The Garcias stipulated that their predecessors traveled along the Driveway to Parcel 31 *before* traveling from Parcel 31 to Parcel 20. Their ingress and egress thus occurred between Parcel 31 and Paradise Valley Road, not between Parcel 20 and Paradise Valley Road. Even if their ultimate destination was the house on Parcel 20, they went there by way of Parcel 31.

The Garcias contend such use of the Driveway was "inherently hostile" because the Harrises knew the Garcias' predecessors were using the Driveway to access residential and commercial structures on Parcel 20, rather than terminating their travel on Parcel 31. (Capitalization omitted.) But the Garcias offer no case law or other authority in support of their position. Nor are we aware of any such authority. As we have explained, the Garcias' predecessors operated within the scope of the Easement as owners of Parcel 31. They used the Driveway for ingress and egress to Parcel 31 before traveling from Parcel 31 to Parcel 20. The Harrises could not have prevented the Garcias' predecessors from using the Driveway in that manner. As Mr. Harris explained, he could not object to Phelps's use of the Driveway because she "accesse[d] the parcel that ha[d] the valid easement and from there she can go wherever she wants. She's on her property." Thus, because the predecessors' use fell within the scope of the Easement, substantial evidence supports the trial court's finding that their use was not hostile.

The Garcias separately contend their predecessors expanded the use of the Easement in a manner that created a separate prescriptive easement.

19

We do not understand exactly how this contention differs from the Garcias' argument in favor of "inherent[ ]" hostility. Both contentions rely on the Garcias' predecessors using the Easement in a manner outside of the scope of their rights to use the Easement as owners of Parcel 31. The Garcias seem to focus on the increasing use of the Easement "over the years" as somehow providing an independent basis to establish the hostility necessary for a prescriptive easement. However, neither of the cases relied on by the Garcias are analogous to the circumstances here.

First, in *McBride, supra*, 18 Cal.App.5th at page 1180, the plaintiff sought a prescriptive easement over a portion of a neighbor's property. The plaintiff already owned a "Secondary Access Easement" over that portion of the neighbor's property but alleged she had used it for primary access, rather than secondary access, for the requisite statutory period. (*Id.* at p. 1182.) The Court of Appeal concluded the alleged facts were sufficient to support a cause of action for prescriptive easement and reversed the trial court's decision to sustain a demurrer to that cause of action. (*Ibid.*) Setting aside the procedural differences between *McBride* and this case, the alleged hostility is not the same. The plaintiff in McBride allegedly operated outside of the literal scope of an express easement by using a "Secondary Access Easement" for primary access. (*Ibid.*) In contrast here, the use of the Driveway by the Garcias' predecessors fell within the literal scope of the Easement ("ingress and egress" to Parcel 31) while ultimately traveling to a different parcel beyond Parcel 31. Nothing in *McBride* compels the conclusion that the use of the Driveway by the Garcias' predecessors was adverse to the Harrises.

Second, the Garcias identify *Kerr Land & Timber Co. v. Emmerson* (1965) 233 Cal.App.2d 200. *Kerr* involved the scope of an easement for

20

transporting timber harvested in properties "lying on various sides" of the property bearing the easement. (*Id.* at p. 208.) Suit was filed after the easement had been used to haul timber from at least 12 miles away and after the easement owners had charged tolls for others to use the easement. (*Id.* at pp. 210–211.) The Court of Appeal reversed the trial court's finding that " 'lying on various sides' " meant adjacent to the burdened property and remanded for additional findings on the intended scope of the easement. (*Id.* at p. 227.) The case was also remanded for additional findings regarding the existence of a prescriptive easement, which depended on the scope of the express easement. (*Id.* at pp. 233–234.)

Unlike *Kerr*, which involved the question of how far away is too far to fall within the scope of an express easement, the Garcias' predecessors operated within the literal scope of the express easement burdening Parcel 30. They used it for ingress and egress to Parcel 31, even when their journey ultimately concluded at Parcel 20. Nothing in *Kerr* indicates a limitation should be added to the otherwise clear language of an express easement.

Even if the cases cited by the Garcias held otherwise, the trial court here made factual findings contrary to the Garcias' position. The Garcias claim "the scope of the Easement ha[d] been greatly expanded over the years," but the court found "the weight of the evidence presented at this trial indicate[d] that the owners of the express easement used the [D]riveway in a manner consistent with the express easement and did not overburden the [E]asement." Substantial evidence developed at trial supports those findings. Mrs. Showman testified she used the Driveway at least once or twice a week when she lived on Parcel 20 between 1976 and 2003. And at the Driveway's highest point of use between 2008 and 2015 when Phelps owned Parcels 20

21

and 31, Mrs. Harris testified Phelps and Bayuk used the Driveway daily. Bayuk testified customers used the Driveway once per week and others connected with the business (e.g., veterinarians) used the Driveway less frequently. While use of the Driveway may have increased, substantial evidence supports the court's conclusion that such use did not expand beyond the original scope of the Easement (i.e., ingress/egress) and did not overburden the Easement.

We thus affirm the trial court's judgment in favor of the Harrises on the Garcias' first cause of action for prescriptive easement.

## III.

### *Equitable Easement*

California courts have long "had the discretionary authority to deny a landowner's request to eject a trespasser and instead force the landowner to accept damages as compensation for the judicial creation of an easement over the trespassed-upon property in the trespasser's favor." (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19 (*Shoen*).) Three requirements must be established for a court to have discretion to grant an equitable easement to a trespasser: (1) the trespass must have been innocent, rather than willful or negligent; (2) the public or the property owner will not be irreparably injured by the easement; and (3) the hardship to the trespasser from having to cease the trespass must be greatly disproportionate to the hardship caused by the continued encroachment. (*Ibid*.) "Unless all three prerequisites are established, a court lacks the discretion to grant an equitable easement." (*Ibid*.)

The trial court found the Garcias failed to meet their burden of establishing the first and third requirements: " 'innocent' " trespass and " 'greatly disproportionate' " hardship. The Garcias contend the court erred

22

in its findings.  We review the court's application of the equitable easement doctrine for abuse of discretion.[7]  (*Shoen*, *supra*, 237 Cal.App.4th at p. 20.)  That standard requires "we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision ' "falls within the permissible range of options set by the legal criteria." ' "  (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771.)  In other words, an abuse of discretion only appears when the trial court "exceeded the bounds of reason."  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478.)  We conclude the court did not abuse its discretion in denying the Garcias an equitable easement.

The Garcias contend the trial court erred in finding they were not innocent trespassers because they had a "reasonable belief" their purchase of Parcel 20 included access via the Driveway.  This argument overlooks the governing standard of review.  The Garcias fail to acknowledge the evidence on which the court relied in finding them negligent.  In particular, the court identified a " 'Seller Property Questionnaire' " received by the Garcias, which advised them, " 'Seller does not guarantee access to the property over the current driveway.' "  The court also noted the Garcias' purchase agreement advised them, " 'Confirmation of recorded shared driveway easement to be confirmed prior to [close of escrow].' "  In light of those disclosures, the court reasonably found the Garcias were on notice of the potential unavailability of the Driveway to access Parcel 20.  The court also reasonably found the

---

7    The Garcias contend the abuse of discretion standard does not apply here because the court denied equitable relief and therefore made "no finding in equity."  The Garcias cite no authority for their position that grants of equitable easements should have a different standard of review than denials. We see no reasoned basis for such a distinction, as the court is deciding whether to act in equity in both cases, and therefore we do not apply a de novo standard.

Garcias' assumption that the escrow officer confirmed the purported easement insufficient to avoid a finding of negligence, where they neither ensured confirmation of the purported easement nor affirmatively obtained an easement.

On this record, we cannot say the trial court exceeded the bounds of reason. Instead, its negligence finding fell squarely within the permissible range of options based on the evidence adduced at trial. We therefore conclude the trial court did not abuse its discretion in finding the Garcias were not innocent trespassers.

We also conclude the trial court did not abuse its discretion in its weighing of the relative hardships to the parties. The court concluded the hardship to the Garcias from having to cease use of the Driveway would not be " 'greatly disproportionate' " to the hardship caused to the Harrises by the Garcias' continuing use. In reaching that conclusion, the court determined the Garcias were *not* credible in their testimony regarding "the potential expense and difficulty of creating a driveway on their own property." Relying on its own inspection of the properties, the court found the Garcias' use of the Driveway was "essentially a matter of convenience," as "[t]hey can easily make a hole in their fence along the southern boundary of their property and install their own dirt driveway onto their property." The court gave no weight to Mr. Garcia's testimony that installation of a new driveway would cost as much as $150,000 because of the absence of a "reasoned basis" for the estimate. Instead, it concluded "the Garcias [we]re exaggerating the supposed difficulty of putting a new dirt driveway on their own property."

Moreover, the trial court determined that, even if the Garcias had established the elements necessary for the creation of an equitable easement, it "would nevertheless exercise its discretion to deny the request" because

24

"[t]he overall balance of the equities in this case favors the Harrises over the Garcias."

The Garcias fail to grapple with the trial court's resolution of credibility and factual findings. Instead, they simply refer to their own trial testimony, which the court rejected as not credible, to support a contrary decision. This again overlooks the governing standard of review. We are not permitted to ignore or reconsider the trial court's resolution of credibility. (*Executive Life*, *supra*, 32 Cal.App.4th at p. 358.) Having found the Garcias' trespass was not innocent and the hardship to the Garcias would not be greatly disproportionate to the hardship to the Harrises caused by the continued encroachment, the court *lacked* the discretion to grant an equitable easement. (*Shoen*, *supra*, 237 Cal.App.4th at p. 19.) Accordingly, the trial court's denial of an equitable easement was not an abuse of discretion.

IV.

*Declaratory Relief*

In their third cause of action for declaratory relief, the Garcias sought "a judicial determination of their right to use the [Driveway] in the manner described in [the Garcias' 2018 grant deed] and consistent with the use by the prior owners of [Parcel 20]." The Garcias advanced two theories in support of their claim. First, the Garcias argued an irrevocable license had been created by the Harrises' inaction in response to their predecessors' use of the Driveway to access Parcel 20. Second, the Garcias argued the Tobins' 1975 grant deed to the Johnsons had created an express easement for the benefit of Parcel 20 pursuant to the doctrine of after-acquired title.

The trial court rejected both theories. It found "no factual basis for concluding that any person ever obtained an irrevocable license to use the [D]riveway," as none of the Garcias' predecessors used the Driveway in a

25

manner hostile to the Harrises. As for the doctrine of after-acquired title, the court found it inapplicable because the Harrises did not grant anything to the Garcias and "it would be inequitable to apply any type of estoppel doctrine to the Harrises in this case." Accordingly, the court found invalid the "purported easement [over Parcel 30] in the deed conveying Parcel 20 to the Garcias" because no such easement benefitting Parcel 20 existed at the time of the conveyance. "Phelps could not convey something she did not own."

The Garcias contend the trial court erred on both counts. We address each count and conclude the Garcias' contentions are not meritorious.

A.     *No Irrevocable License*

We review the decision of whether to grant an irrevocable license for abuse of discretion. (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751 (*Richardson*).) We conclude the trial court did not abuse its discretion when it found "no factual basis for concluding that any person ever obtained an irrevocable license to use the [D]riveway."

" 'A license gives authority to a licensee to perform an act or acts on the property of another pursuant to the express or implied permission of the owner.' " (*Richardson, supra*, 233 Cal.App.4th at p. 751.) Such license can generally be revoked by the licensor at any time without excuse or consideration to the licensee. (*Ibid.*) Further, " 'conveyance of the property burdened with a license revokes the license.' " (*Ibid.*) A license may become irrevocable if two conditions are met: (1) "a landowner knowingly permits another to repeatedly perform acts on his or her land," and (2) "the licensee, in reasonable reliance on the continuation of the license, has expended time and a substantial amount of money on improvements with the licensor's knowledge." (*Ibid.*) An irrevocable license is the equivalent of an easement. (*Ibid.*)

26

The Garcias contend their predecessors obtained an irrevocable license to use the Driveway. Under the first condition for an irrevocable license, the Garcias argue the Harrises "knowingly permitted" the Garcias' predecessors to use the Driveway by not making efforts to stop such use. The Garcias' argument ignores the Easement owned by their predecessors, as the owners of Parcel 31. The Harrises had no need to permit the Garcias' predecessors to use the Driveway (implicitly or explicitly) because they already had a right to use it to access Parcel 31. Thus, the predecessors' use cannot be considered to show any implied permission from the Harrises. The Garcias also point to when the Harrises gave Schmidt and Phelps express permission to widen the entrance to the Driveway to accommodate transport of a manufactured home. This sort of temporary, one-time permission, however, does not give rise to an irrevocable license, as it does not involve "repeatedly perform[ing] acts" on another's land. (*Richardson*, *supra*, 233 Cal.App.4th at p. 751.) In any event, the manufactured home was moved onto Parcel 31, not Parcel 20, and therefore could not result in an irrevocable license benefitting the latter.

Nor could the Garcias' own use of the Driveway result in an irrevocable license. The Garcias acknowledge the Harrises made efforts to stop the Garcias from using the Driveway soon after they moved onto Parcel 20. The Harrises explicitly informed the Garcias they had no right to use the Driveway. The Garcias' use of the Driveway on their few visits to Parcel 20 prior to purchasing it did not amount to the Harrises impliedly "permit[ting] another to repeatedly perform acts" on Parcel 30. (*Richardson*, *supra*, 233 Cal.App.4th at p. 751.) In deciding to purchase Parcel 20, the Garcias could not reasonably rely on having access to the Driveway based on such scant information. Nor could they reasonably rely on future use of the Driveway when making post-purchase improvements to Parcel 20 and the Driveway, as

the Harrises had already informed the Garcias they had no right to use the Driveway.

B.    *No Express Easement over Parcel 30 Was Created to Benefit Parcel 20*

The Garcias further contend they had an express easement to use the Driveway based on the doctrine of after-acquired title.  We review interpretations of the language of a deed de novo.  (*Pear*, *supra*, 67 Cal.App.5th at p. 71.)  In contrast, any factual findings regarding extrinsic evidence are reviewed for substantial evidence.  (*Ibid.*)  Under those standards of review, we agree with the trial court that the Garcias do not have an express easement to use the Driveway.

Easement grants are interpreted like contracts.  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 521.)  "Although extrinsic evidence is not permitted in order to add to, detract from, or vary the terms of an integrated written agreement, extrinsic evidence is admissible in order to explain what those terms are.  [Citations.]  Therefore, extrinsic evidence as to the circumstances under which a written instrument was made has been held to be admissible in ascertaining the parties' expressed intentions, subject to the limitation that extrinsic evidence is not admissible in order to give the terms of a written instrument a meaning of which they are not reasonably susceptible."  (*Id.* at pp. 521–522.)  In other words, when the language of a deed is ambiguous, evidence outside the document is admissible to determine the intention of the grantor.  (*Id.* at pp. 522–523.)

Grants are to be interpreted in favor of the grantee.  (Civ. Code, § 1069.)  Thus, " 'doubtful clauses in the deed are to be construed most strongly against the grantor, and as favorably to the grantee as the language, *construed in the light of the surrounding facts*, will justify.' "  (*City of*

28

*Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 242–243, italics added (*Manhattan Beach*).)

Under the doctrine of after-acquired title, "if a grantor purports to convey an interest in land which the grantor does not own, but afterwards acquires, the interest passes to the grantee at the time the grantor obtains it." (*Noronha v. Stewart* (1988) 199 Cal.App.3d 485, 489.) This has been codified for grants of fee simple in Civil Code section 1106. However, the common-law rule is broader and " 'applies to the transfer of *any* estate.' " (*Noronha*, at p. 490.)

The Garcias contend they received an express easement to use the Driveway through their purchase of Parcel 20. Their contention stems from the Tobins' sale of Parcels 20 and 31 to the Johnsons in 1975. The Johnsons' 1975 grant deed identified the transferred interests as follows:

> "PARCEL 1:
>
> "That portion of the Southwest Quarter of the Northwest Quarter of Section 26, Township 9 South, Range 2 East, San Bernardino Base and Meridian, according to the United States Official Survey thereof, approved January 31, 1895, in the County of San Diego, State of California, described as follows:
>
> "COMMENCING at [legal description omitted]."
>
> "PARCEL 2:
>
> "An easement for ingress and egress, repairs, installation and maintenance of water, gas, sewer, and power lines and conduit, installation and maintenance and repairs of poles, guide wires and lines for transmission of electrical energy over that portion of the Southwest Quarter of the Northwest Quarter of Section 26, Township 9 South, Range 2 East, San Bernardino Base and Meridian, according to the United States Official Survey thereof, approved January 31, 1895, in the County of San Diego, State of California, described as follows:
>
> "COMMENCING at [legal description omitted].

29

"PARCEL 3:

"All that portion of Lot 5 -the Southwest Quarter of the Northwest Quarter- of Section 26, Township 9 South, Range 2 East, San Bernardino Base and Meridian, in the County of San Diego, State of California, according to Official Plat thereof, described as follows:

"BEGINNING at [legal description omitted]."

The Garcias argue the Johnsons' 1975 grant deed was ambiguous regarding whether the easement for ingress and egress over Parcel 30 (identified as "PARCEL 2" in the grant deed) benefitted Parcel 31 (identified as "PARCEL 1"), Parcel 20 (identified as "PARCEL 3"), or both. (Underscoring omitted.)  Given the ambiguity, the Garcias argue the deed must be interpreted broadly in favor of the Johnsons as grantees so that the easement benefits both Parcels 20 and 31.  The Garcias acknowledge the Tobins had only received an easement benefitting Parcel 31 from Silveria in 1966.  This made the easement in the Johnsons' 1975 deed an unauthorized grant in that it purported to benefit Parcel 20.  Despite the grant being originally unauthorized, the Garcias contend the doctrine of after-acquired title perfected the grant.  Specifically, the Tobins acquired Parcel 30 after deeding the easement to the Johnsons.  The Garcias argue the Tobins' acquisition of Parcel 30 "validated the additional grant of an express [e]asement . . . to benefit Parcel 20 and burden Parcel 30."

The problem with the Garcias' theory is that they jump from ambiguity in the Johnsons' 1975 grant deed to the rule that grants must be construed in favor of the grantee.  The Garcias do not consider extrinsic evidence regarding the intended scope of the Johnson's grant deed.  Our Supreme Court has held that even where a deed is facially ambiguous, the instruction to favor the grantee must yield to how broadly the " 'surrounding facts' " (i.e., extrinsic evidence) allow the language to be construed.  (*Manhattan Beach*,

30

*supra*, 13 Cal.4th at pp. 242–243.) The language of the 1975 deed from the Tobins to the Johnsons is arguably ambiguous, as the Garcias contend. However, even a cursory analysis of the chains of title of the two properties transferred—Parcels 20 and 31—would have shown the easement was only meant to benefit Parcel 31.

The first two parcels ("PARCEL 1" and "PARCEL 2") listed in the Johnsons' 1975 grant deed match the parcel descriptions in the 1966 grant deed from Silveria to the Tobins that transferred Parcel 31 and created the Easement over Parcel 30. (Underscoring omitted.) The Tobins' 1966 grant deed made no reference to Parcel 20. In contrast, the third parcel ("PARCEL 3") listed in the Johnsons' 1975 grant deed matches the parcel description in the 1969 grant deed conveying Parcel 20 to the Tobins. (Underscoring omitted.) That 1969 grant deed made no reference to any easement or to Parcel 31. The Tobins owned Parcels 20 and 31 as separately assessed parcels between 1969 and 1975. They transferred those same, separately assessed parcels to the Johnsons, rather than attempting to have them reassessed as a single parcel. Accordingly, the extrinsic evidence shows the Tobins intended to transfer the exact property interests received in the 1966 and 1969 grant deeds. The only easement in those deeds was transferred along with and for the benefit of Parcel 31.

Phelps's attempt in 2018 to have the Harrises sign paperwork granting an easement for the benefit of Parcel 20 supports this conclusion. As the first party to sell Parcel 20 separate from Parcel 31 since the 1960s, Phelps indicated through her actions that she did not understand Parcel 20 to have the benefit of the Easement over Parcel 30. Thus, the extrinsic evidence establishes that the Tobins did not intend to transfer an easement benefitting Parcel 20. The language of the Johnson's 1975 grant deed, in light of the

31

extrinsic evidence, does not justify an interpretation that the transferred easement benefits Parcel 20, even when construed most favorably for the grantee.

Because the Tobins never granted the Johnsons an easement benefitting Parcel 20, the doctrine of after-acquired title does not apply to validate such a grant. The Garcias therefore did not receive an easement benefitting Parcel 20 as successors-in-interest to the Johnsons. We thus conclude the trial court correctly denied the Garcias declaratory relief under the doctrine of after-acquired title.

For all of the reasons we have discussed, substantial evidence supports the trial court's finding that the purported express easement over Parcel 30 conveyed by Phelps to the Garcias was invalid. The court therefore did not err by granting the Harrises' request to quiet title, as set forth in their cross-complaint. Accordingly, we affirm the court's judgment against the Garcias on their cause of action for declaratory relief and the court's judgment for the Harrises on their cause of action to quiet title.

V.

*Motion for Sanctions*

The Harrises filed a motion for monetary sanctions against the Garcias. They contend the Garcias' appeal was meant to improperly delay the effect of the trial court's judgment. They further contend the Garcias' appeal "indisputably has no merit," as shown by its ignorance of the "clearly applicable" standards of review.

The Garcias' appeal stretches the bounds of zealous advocacy at times, particularly with respect to the standards of review. The Garcias' reply brief also uses unnecessarily derogative language (e.g., "the Harrises insipidly claim"; "half-baked analysis"; "laughably incorrect"), made worse by the fact

32

that the Garcias, not the Harrises, were the ones advocating the incorrect position.  Although a close call, we do not conclude the Garcias' appeal was so totally and completely without merit to be objectively frivolous.  (See *Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 834.)  We therefore deny the Harrises' motion for monetary sanctions.

## DISPOSITION

The judgment on the Garcias' complaint and the judgment on the Harrises' cross-complaint are affirmed.  The Harrises are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.

33